# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

        v.          :          **Crim. No. 23-351**

JOSHUA COLEMAN          :

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Joshua Coleman stands before this Court for sentencing in a $72 million fraud scheme that he orchestrated and carried out from August 2020 to June 2022.   During that time, the defendant deceived two lenders (Lender #1 and Lender #2) into loaning approximately $72 million dollars to companies owned and controlled by the defendant, who falsely represented to the lenders that the money would be used to purchase insurance companies.   Of the $72 million, the defendant used only approximately $10.9 million to buy insurance companies.   He used the remaining $61 million to pay for personal expenses, business debts, and other companies that he owned and controlled.   To carry out and conceal the scheme, the defendant repeatedly and brazenly lied to the victims and others, created false documents, and forged signatures.   The loans were secured by collateral, and before the defendant's scheme was detected, he took steps to devalue the collateral, thus preventing Lender #2 from recovering millions of dollars that the defendant misappropriated.

For the reasons described below, the government recommends that the Court sentence the defendant to term of imprisonment within the 51- to 63-month guidelines range along with three years of supervised release, restitution to the victims in the amount of $57,239,616.86, and forfeiture money of judgment of $24,709,275.50.

I.    **PROCEDURAL HISTORY**

On August 15, 2023, the government filed an Information charging the defendant with four-counts of wire fraud, in violation of 18 U.S.C. § 1343.    (ECF No. 1.)    Before the Information was filed, the parties entered into a plea agreement pursuant to which the defendant agreed to plead guilty to the four counts, waiving his right to be charged by Indictment.    On September 26, 2023, the Court conducted a guilty plea hearing, during which the Court accepted the defendant's guilty plea pursuant to the plea agreement.

II.    **FACTS OF THE CASE**

*The Defendant's Fraud on Lender #1*

In August 2020, the defendant sought a loan from Lender #1, on behalf of Company #1 and related companies.    The defendant falsely represented to Lender #1 that the money was needed for Company #1 to acquire insurance companies.    Based on that false representation, Lender #1 agreed to provide approximately $25 million.

Despite promising to use the money to buy insurance companies, one day after obtaining the loan proceeds, the defendant wired a total of approximately $20.2 million to Individuals #1 and #2 and their associated entity.    Individuals #1 and #2 were former investment advisor clients of the defendant, and, in May 2020, the defendant entered into an agreement acknowledging that he used approximately $20 million of their assets without their knowledge or consent and agreeing to pay back the debt with interest.    In sum, the defendant used most of Lender #1's money to repay earlier investors whose money he misappropriated.

Despite the fact that the defendant had spent most of the money provided to him by Lender #1, for months, he falsely represented to Lender #1 that he had not yet done so.    When

Lender #1 asked for documentary proof that the defendant still had the money, the defendant

provided doctored bank statements.   For example:

- On June 9, 2021, the defendant emailed Lender #1 a bank statement of Company #1

  showing that the account holding the money had approximately $20,071,066.34,

  when, in fact, the account balance on that date was $3,566.34.

- Similarly, on July 23, 2021, the defendant emailed a bank statement of Company #1

  reflecting an account balance of $25,073,917.14, when, in fact, the account balance

  on that date was $0.

In late July 2021, the defendant needed millions of dollars to purchase an actual

insurance company and he asked Lender #1 for the money.   Lender #1 advised the defendant

that he should use a portion of the money that Lender #1 previously provided.   Ultimately, the

defendant admitted to Lender #1 that he had spent a substantial amount of the $25 million.

Critically, however, the defendant did not admit that he used the money to pay back

investors whose money he used without authorization, because this would have revealed the

defendant's Ponzi-scheme-like activity and caused Lender #1 to declare a default on the loan.

Rather, the defendant told Lender #1 that he used the money to buy an energy company.   To

substantiate this false claim (as charged in Count One), the defendant provided to Lender #1 a

purchase agreement and a bank statement purporting to show that the defendant paid $20 million

for the energy company in September 2020.   Both these documents were false, as the authentic

purchase agreement and authentic bank records show that the transaction took place in December

2018.

Based on these false representations, Lender #1 did not immediately declare a default on

its loan and instead accepted from the defendant a lien on the assets of the energy company and agreed to work with the defendant on recouping the balance of the loan.   To further prevent Lender #1 from declaring a default, the defendant claimed to have assets that would be used to repay Lender #1.   On several occasions, including through emails dated August 11, 2021 and November 23, 2021 (as charged in Count Three), the defendant sent to Lender #1 doctored account statements and other records showing a Company #1 bank account had over $20 million, when, in fact, there was no money in that bank account at those times.

The defendant also continued his fraud on Lender #1 into 2022 by creating more false documents.   From March 2022 to June 2022, the defendant repeatedly claimed that Company #1 had approximately $10 million in a bank account that would be used to repay Lender #1 and sent Lender #1 doctored bank statements and other bank records to substantiate his false claim.   In truth, the account had, at most, approximately $10,000 during this time period.   In another attempt to convince Lender #1 that he had money to repay, on March 18, 2022, the defendant emailed to Lender #1 an asset purchase agreement purporting to show that a company had invested $10 million in Company #1 in exchange for equity in Company #1.   In truth, the company had never entered into the agreement, and the defendant created the false asset purchase agreement and forged the signature of the company representative.   Lender #1 discovered the forgery in June 2022, and shortly thereafter, Lender #1 declared a default on the loan.

*The Defendant's Fraud on Lender #2*

By August 2021, the defendant needed millions of dollars to repay Lender #1 and other business debts that he incurred and to purchase two actual insurance companies.   In or about

4

September 2021, he began to negotiate with Lender #2 for a loan that authorized the defendant to use loan proceeds to purchase insurance companies.   The defendant sought to obtain the loan via other companies owned and controlled by him—i.e., Companies #2 and #3—because Lender #1 had liens on the assets of Company #1.

The loan agreement was signed on October 22, 2021.   Before the loan agreement could become fully effective, the defendant had to provide proof that certain liens had been terminated by November 2, 2021.   As charged in Count Two, the defendant provided what purported to be four lien termination forms from the Delaware Secretary of State and Illinois Secretary of State to Lender #2 before the November 2, 2021 deadline.   In truth, all four liens were still in place on November 2, 2021.

The defendant falsified other critical documents in order to convince Lender #2 to enter into the loan agreement.   As a condition of the loan, Lender #2 required that certain entities serve as guarantors—i.e., entities that would be responsible for repaying the loan in the event of a default.   Two such entities were Family Trust #1, which owned approximately four percent of a subsidiary of Company #2, and Company #4.   On or about November 2, 2021, the defendant forged the signatures of the trustee of Family Trust #1 and representative of Company #4, without their consent or authorization, on documents that were necessary to make Family Trust #1 and Company #4 guarantors to the loan agreement with Lender #2.   Based on the defendant's false representations and forgeries, Lender #2 agreed to enter into the loan agreement.

The defendant continued to lie to Lender #2 after the loan agreement was in place. Unlike the loan with Lender #1, Lender #2 did not provide the money to the defendant right

away.   Rather, in order to get loan proceeds from Lender #2, the defendant had to provide

documentation showing why loan proceeds were needed and how much proceeds were needed.

Based on the defendant's false representations that funds would be used to acquire certain

insurance companies and forged documents, Lender #2 agreed to wire the following amounts a

bank account controlled by the defendant:

| Date | Approximate Amount Wired | Purpose of the Loan Disbursement, based on the Defendant's Representations |
|---|---|---|
| October 22, 2021 | $10,000,000 | Acquisition of Insurance Company #1 |
| November 2, 2021 | $6,600,000 | Acquisition of Insurance Company #2 |
| December 23, 2021 | $8,365,850.67 | Acquisition of Insurance Companies #3, 4, and 5 |
| December 28, 2021 | $11,590,418.59 | Acquisition of Insurance Company #6 |
| February 16, 2022 | $11,108,100.20 | Acquisition of Insurance Company #7 |

In order to obtain the $6.6 million for the purchase of Insurance Company #2, the

defendant provided to Lender #2 a letter dated September 21, 2021 that was purportedly signed

by the representatives of Insurance Company #2.   Paragraph 1 of the letter stated that the buyer

of Insurance Company #2 "shall be changed to" Company #3—i.e., the borrower under the

Lender #2 loan agreement.   Based on this representation, among others, Lender #2 agreed to

provide the $6.6 million because Lender #2 would have had a lien on the assets of Insurance

Company #2 if the loan went into default.   Records produced by Insurance Company #2 show

that there was a September 21, 2021 letter signed by the representatives of Insurance Company

#2.   However, Paragraph 1 of the letter states that the purchase price is to be increased by

$30,000; there is no mention of the buyer being changed to Company #3.   The letter further

stated, and other authentic documents show, that the actual purchaser was a subsidiary of

Company #1, which was not a borrower or guarantor on the Lender #2 loan agreement.

Lender #2 provided the defendant millions of dollars on three other occasions.   On

December 23, 2021, and December 28, 2021, the defendant caused Lender #2 to disburse $8.4 million and $11.5 million on the loan.   Lender #2 did so based on the defendant's representations that he needed the money to purchase Insurance Companies #3, #4, #5, and #6. The defendant provided to Lender #2 asset purchase agreements between these companies and Company #3 and other information to substantiate his false claims.   In fact, Insurance Companies #3, #4, #5 and #6 were never purchased by Company #2 or Company #3 and had never entered into the asset purchase agreements that the defendant sent to Lender #2.

Finally, on February 16, 2022, Lender #2 wired $11.1 million dollars to fund the purchase of Insurance Company #7, as requested by the defendant.   As charged in Count Four, on February 15, 2022, the defendant emailed Lender #2 an asset purchase agreement between Company #3 and Insurance Company #7, signed by the owner of Insurance Company #7.   In fact, Insurance Company #7 was never acquired by the defendant or any of his companies, and the defendant forged, or caused the forgery of, the owner's signature on the asset purchase agreement.

After obtaining the money from Lender #2, the defendant repeatedly lied to prevent Lender #2 from discovering that he misappropriated the money.   Pursuant to the Lender #2 loan agreement, the defendant was required to report on the financial status of the companies that were acquired by Company #3.   Despite the fact that Insurance Company #1 was the only company that the defendant acquired, on numerous occasions from February 2022 to June 2022, the defendant emailed to Lender #2 reports about the financial performance of Insurance Companies #2, 3, 4, 5, 6, and 7.   The defendant sent these reports in order to give the false impression to Lender #2 that Company #3 had acquired these companies, when, in fact, it had

not.

On March 1, 2022, Lender #2 asked defendant Coleman to provide "the statements showing the wires made for the purchases of the most recent 5 businesses"—i.e., Insurance Companies #3, 4, 5, 6, and 7.   The defendant said that he could not provide the information for Insurance Company #7 because the February 2022 bank statement was not available.   On March 2, 2022, the defendant emailed to Lender #2 a bank statement, which he said showed the "acquisition wires" for Insurance Companies #3, 4, 5, and 6.   This bank statement was heavily, heavily doctored by the defendant and is different from the authentic bank statement in several critical respects:

- The actual bank statement does not show any wires of money to the owners of Insurance Companies #3, 4, 5, and 6 because the transactions never happened.

- The actual bank statement shows at least 6 overdrafts and numerous returned payments in the month of December 2021, whereas none of this activity appears in the doctored bank statement.

- The actual bank statement includes hundreds of thousands of dollars in payments for unrelated business debts and personal expenses—including a $1.1 million payment to his parents and $60,000 and $150,000 transfers to his personal bank account—and all this information is omitted from the doctored bank statement.

The defendant sent similarly doctored bank statements to Lender #2 in February 2022 and June 2022.

After discovering that the defendant had misappropriated Lender #2's money and some of the other misconduct described above, in July 2022, Lender #2 declared a default on the loan.

8

*The Defendant's Use of Fraud Proceeds*

In total, the defendant received approximately $47.6 million from Lender #2. Approximately $10.9 million was used to purchase Insurance Company #1.   The remaining $36.8 million was misappropriated by the defendant.

Most of the money was spent on unrelated business debts.   For example, the defendant used approximately $11.5 million of the funds from Lender #2 to repay Lender #1.   On November 2, 2021—the day he received $6.6 million from Lender #2—the defendant paid approximately $5.9 million to another creditor that loaned him and his companies money in August and September 2021.   On December 23, 2021—the day he received $8.4 million from Lender #2—the defendant paid another creditor approximately $3.33 million.   The defendant used an additional approximately $9.3 million of the funds from Lender #2 to repay other lenders.   On February 16, 2022—the day he received $11.1 million from Lender #2—the defendant wired $300,000 to a law firm to pay the portion of a settlement agreement in a lawsuit involving one of his companies.

The defendant also transferred over $1.5 million of the money provided by Lender #2 to the operating accounts of other companies that he owned and controlled.

The defendant also used the money from Lender #2 to pay for his own personal expenses. For example, on October 22, 2021—the day he received $10 million from Lender #2—the defendant transferred approximately $1.27 million into his personal bank account and later used that money to repay a $5 million loan to himself, his wife, and a family trust.   The defendant later used Lender #2's money to make $500,000 in additional payments on this loan.   From this $10 million loan, the defendant diverted approximately $100,000 to his personal bank account

and used that amount to pay, among other things, the property tax bill on his house in North Wales and personal credit card bills.   On December 24, 2021—the day after receiving $8.4 million from Lender #2—the defendant paid his parents $1.1 million and transferred $60,000 into a personal bank account.   On December 28, 2021—the day he received $11.6 million from Lender #2—the defendant transferred $150,000 into a personal bank account.   The defendant used the $210,000 that was transferred into his personal account in late December 2021 for personal expenses, including credit card bills.   On February 18, 2022, the defendant used approximately $3,500 to pay membership dues to his country club.   The defendant used approximately $17,000 of the money obtained from Lender #2 to make mortgage and tax payments on a vacation/rental property in Ocean City, New Jersey.

*Affirmative Steps to Devalue Collateral*

Lender #2 obtained collateral in exchange for the loan made to Companies #2 and #3. Part of the collateral was the defendant's ownership interest in the energy company previously described on pages 3 and 4.   In February 2022, the defendant agreed to sell a portion of his ownership in the energy company for approximately $17.25 million.   On March 23, 2022, the defendant—acting on behalf of Companies #2 and #3—signed a contract with Lender #2 in which Lender #2 agreed to allow the defendant to complete the sale as long as: (i) the funds would be used "to fund the working capital needs" of Companies #2 and #3; and (ii) the "consideration received" from the sale was "not less than $17,250,000."   The sale of the energy company closed in April 2022.   On April 18, 2022—in direct contravention of the March 23, 2022 contract with Lender #2—the defendant caused $6 million of the $17.25 million to be paid to a third-party creditor.

### III.    SENTENCING CALCULATION

#### a.  Statutory Maximum Sentences

The statutory maximum penalty for each of the four wire fraud counts is 20 years' imprisonment, a 3-year term of supervised release, a $250,000 fine, and a $100 special assessment.   The total maximum sentence is 80 years' imprisonment, three years' supervised release, a $1,000,000 fine, and a $400 special assessment.

#### b.  Sentencing Guidelines Calculation

The PSR correctly calculates the defendant's applicable advisory guideline range as 51 to 63 months' imprisonment (total offense level 24 and criminal history category I).

The defendant is in criminal history category I because he has no criminal history.

The Probation Office calculated the defendant's offense level as follows:

- The base offense level offense is 7.

- 20 points are added because of fraud loss between $9.5 and $25 million.

- 2 points are added for the use of sophisticated means.

- 3 points are subtracted for acceptance of responsibility and timely plea.

- 2 points are subtracted due to the defendant not having any criminal history points.

*Discussion of Fraud Loss Amount*

The parties agree that the fraud loss amount is between $9.5 to $25 million, and the government agrees with the calculation of fraud loss set forth in the PSR.   (PSR ¶¶ 30–46.)

In calculating the fraud loss for sentencing purposes, the government bears the initial burden of proving loss by a preponderance of the evidence.   *United States v. Lacerda*, 958 F.3d 196, 214 (3d Cir. 2020).   The district court must then calculate the amount of loss associated

with the crime of conviction and any relevant conduct that was "part of the same course of conduct or common scheme or plan." *Id.* (quoting *United States v. Siddons*, 660 F.3d 699, 704 (3d Cir. 2011)).   While the amount of loss "does not have to be an exact figure, it must be a reasonable estimate." *Id.*

The two loans obtained in connection with the fraud scheme were secured by collateral and carried fees, interest, and other charges.   The guidelines provide that the following amounts must be excluded from the Court's fraud loss calculation:

- "[I]nterest of any kind, finance charges, late fees, penalties, . . . or other similar costs."

- "Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense."

- Principal payments made before the offense was detected.

- "[T]he amount the victim has recovered at the time of sentencing from the disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

USSG § 2B1.1, Note 3(D), (E)(i), (E)(ii).

For the reasons stated in the PSR, a preponderance of the evidence shows that the loss associated with Lender #1 and Lender #2 is as follows:

- **Lender #1:** no loss because the principal amount of the loan was recovered in connection with the *In re Vesta Holdings, LLC* bankruptcy proceeding (Case No. 22-11019 (Bankr. D. Del.).)   While Lender #1 has provided to the government documentation showing that the total indebtedness resulting from its dealings with

12

Company #1 was $147.4 million, that amount includes various fees and interest, which are not recoverable under the Sentencing Guidelines.   For the reasons discussed in Section IV.G, Lender #1 is entitled to restitution for costs recoverable under *Lagos v. United States*, 584 U.S. 577 (2018).

- **Lender #2:** The defendant obtained from Lender #2 $47,664,369.46 for the purpose of purchasing insurance companies on behalf of Company #2.   Of that amount, only $10,896,251.95 was used to purchase insurance companies.   To date, the defendant has not made any principal payments on the loan.   Accordingly, the loss amount is $36,768,117.51 less the amount that Lender #2 obtained via disposition of the collateral or, for undisposed collateral, the fair market value of that collateral at the time of sentencing.   As described in the PSR, there were 17 sources of collateral. Three of those sources had no value because the defendant lacked the authority to pledge the assets as collateral in the first place, and eight other sources had no financial value.   Lender #1 has obtained a total of approximately $6.3 million via the disposition of collateral and the remaining sources of collateral have a fair market value of $5.75 million, thus resulting in a $12,058,842 credit against loss and a total loss of $24,709,275.50.   As described below in Section IV.G, the restitution amount owed to Lender #2 is higher because the amount reflects unpaid principal, prejudgment interest, and fees.

*Discussion of Sophisticated Means Enhancement*

The sophisticated means enhancement under USSG § 2B1.1(b)(10)(C) applies when the offense "involve[s] sophisticated means and the defendant intentionally engaged in or caused the

conduct constituting sophisticated means." Here, the Probation Office has determined that the enhancement is applicable because "the defendant produced an extensive number of false documents and forgeries and made numerous false statements to obtain the victim funds, delay detection of the scheme, and increase the length of time that the scheme went on." (PSR ¶ 57.)

The government agrees that the sophisticated means enhancement is applicable. The defendant objects to the applicability of the enhancement, arguing that this was a typical fraud scheme, which was too simple for the enhancement to apply. However, as the Probation Office has noted, the defendant's scheme merits the enhancement because the scheme involved blatant lies by the defendant to the victims about the disposition of the loaned monies, doctored bank statements, multiple financial accounts, and forgeries. One or two lies may define a typical fraud scheme, but the repeated lies about the use of the fraudulently obtained monies, combined with the doctored bank statements, misrepresentations about liens, and forged documents enabled the defendant to conceal his fraud scheme to the detriment of the victims. When viewed in their entirety, his actions sufficiently constitute sophisticated means.

The Third Circuit has explained that application of the enhancement "is appropriate where a defendant's conduct 'shows a greater level of planning or concealment than a typical fraud of its kind.'" *United States v. Fountain,* 792 F.3d 310, 219 (3d Cir. 2015) (quoting *United States v. Fumo,* 655 F.3d 288, 315 (3d Cir. 2011). In *Fountain,* the Court held that "[w]hile the Application Notes to § 2B1.1 suggest that the use of fictitious entities, corporate shells, or offshore financial accounts would constitute sophisticated means, an offense can easily warrant the sophisticated means enhancement absent the use of those tactics." 792 F.3d at 319. The defendant's fraudulent conduct involved extensive planning and concealment, that is, lasting

over a decade, $80 to $100 million of fraudulent loans sought during that period that required planning of each loan application, and the preparation of numerous false documents, and extensive efforts to conceal the fraud scheme, including the preparation of bogus bank statements.

The Third Circuit and numerous other courts have also held that coordinated and repetitive conduct can be a sophisticated scheme, even if not no one step is particularly complicated. *See United States v. Norman*, 465 Fed. App'x 110, 125 (3d Cir. 2012); *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005); *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003); *United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003); *United States v. Lewis*, 93 F.3d 1075, 1082 (2d Cir. 1996) (upholding enhancement even though "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return").

The commentary to USSG § 2B1.1 elaborates on what conduct might constitute "sophisticated means."   That note says that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* at cmt. n.9(B).   In *United States v. Kirschner,* 995 F.3d 115 (3d Cir. 2021), the Third Circuit deemed the enhancement applicable where the defendant used various tactics to conceal his fraud scheme, including the use of a pseudonym to conceal his identity and he created fake businesses, social media accounts, and sale invoices to give his scheme the veneer of legitimacy. Thus, the Court relied on the concealment efforts of the defendant in determining that the sophisticated means enhancement was applicable.

Here, even if the Court were to consider the defendant's numerous fraudulent acts simple either in the execution or the concealment of the scheme (which they were not), his various actions set forth above, combined, are sufficient to warrant application of the sophisticated means enhancement.

IV.    <u>**ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS**</u>

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007).    Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.    This Court must also consider all of the sentencing considerations set forth in Section 3553.    Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553.    The relevant § 3553 factors will be discussed in turn.

**A.  The nature and circumstances of the offense.**

This case involves very serious, brazen, and harmful criminal conduct.   From August 2020 to June 2022, the defendant operated a scheme to defraud Lenders #1 and #2 out of millions of dollars.   He sought the loans through companies that he owned and controlled, presumably to give his loan requests the air of legitimacy.   As financial records show, however, the defendant had no intention of using the money for the approved purposes—i.e., to acquire insurance companies.   Rather, almost as soon as he obtained the money from Lenders #1 and Lender #2, the defendant used most of the money to repay unrelated business debts or his own personal expenses.

The scheme started when the defendant, in early September 2020, used approximately $20.2 million of Lender #1's money to repay former investment clients whose money he admitted to using without authorization.   In order to secure the money needed to repay Lender #1 and other creditors, the defendant fraudulently obtained an even bigger loan from Lender #2. The defendant used millions of dollars from Lender #2 to repay Lender #1 and other business debts.

This Ponzi-scheme type behavior can quickly result in significant monetary harm, because there is rarely, if ever, enough money to repay all the victims.   When debts become owed to old victims, the perpetrator of the scheme needs to entice new victims to come up with more money.   As a result, the last victims to invest usually bear the brunt of the harm.   That is exactly what happened here.   When the defendant received money from Lender #1, the defendant paid off debt he owed to Individuals #1 and #2.   He also paid other outstanding debts and converted other money to his personal use.   He bought only one insurance company, which

was not the intent of either Lender #1 or Lender #2.   Thus, when the defendant's criminal conduct was exposed in June 2022, Lenders #1 and #2 were left holding the bag.   While Lender #1 was able to recoup many of its losses through the above-described bankruptcy case, Lender #2—the last victim—is still owed over $56 million in unpaid principal and interest.

It is also notable that the defendant's scheme came to an end once Lender #1 and others discovered in June 2022 that the defendant was forging signatures and creating fake documents. There is every reason to believe that, if his scheme were not exposed, the defendant would have continued to fraudulently obtain money from new victims in an attempt to repay his debts to Lenders #1 and #2 and other creditors.

Regarding the defendant's use of the fraudulently obtained loans, the defendant used most of the victim money to repay other lenders and business debt.   He also used the money to fund his other businesses that he operated and his lifestyle, which included a primary residence in North Wales, Pennsylvania and a vacation home in Ocean City, New Jersey.   These personal expenditures include:

- Over $1.7 million to repay a $5 million loan to himself, his wife, and a family trust;

- Approximately $1.1 million to his parents;

- Over $300,000 paid to his personal bank account and used for property tax payments on his North Wales residence, membership dues at a country club, and personal credit card payments; and

- $17,000 for mortgage and tax payments on the Ocean City, New Jersey property.

As described in Section II and the PSR, to carry out the scheme, the defendant falsified all sorts of documents, including bank statements, asset purchase agreements, lien termination

forms, loan guaranty agreements, letters, and financial reports.   (PSR ¶¶ 13–16, 18–19, 21–23, 27–28.)   He forged, or caused the forgery of, signatures on asset purchase agreements, loan guaranty agreements, and letters.   (*Id.* ¶ 16, 19, 21, 23.)   The defendant then passed off the false and forged documents as authentic in order to obtain the lenders' money and to conceal his misappropriation of the lenders' money.

### B.  The history and characteristics of the defendant.

The defendant has a bachelor's degree in finance and has worked in the financial services industry for most of his adult life.   (*Id.* ¶¶ 91–100.)   The defendant does not have any prior criminal history.   This is accounted for in the guidelines range, because he is in the lowest criminal history category and receives the two-level reduction in his offense level for a zero-point offender.   (PSR ¶ 64.)

The defendant accepted guilt very early in this case.   Shortly after receiving a target letter, he retained defense counsel and later agreed to plead guilty pursuant to an Information. As a result, the government never had to present its case to a grand jury, and the Court did not need to preside over what would have been a lengthy and complicated trial or rule on any pretrial or posttrial motions.   The defendant's early guilty plea allowed the government and Court to allocate their resources efficiently during the pendency of this case.

On the other hand, according to the draft PSR, as of August 15, 2025, the defendant failed to provide to the Probation Office documentation regarding his net worth and monthly cash flow statements, despite numerous requests by the Probation Office.   (Draft PSR ¶ 100 (stating that "As of the date of this report, the defendant has not submitted net worth and monthly cash flow statements (including supporting documentation).   The documents were provided to

19

the defendant on December 5, 2023, and again on August 7, 2025. The defendant was advised in writing on February 20, 2025, and July 29, 2025, that he needed to submit the completed forms as soon as possible.")) On September 5, 2025, the defendant ultimately provided to the Probation Office signed financial disclosure statements, which show a severely negative monthly cash flow, liabilities exceeding assets, and legal judgments and lawsuits against him. (PSR ¶ 101.) The defendant did not submit federal income tax returns for 2021 through 2024, despite being requested to do so by the Probation Office. (PSR ¶ 107.) The tax records that he did provide referenced a family trust, which the defendant did not disclose to the Probation Office. (*Id.*) The defendant's incomplete and late submissions to the Probation Office are concerning. It is also telling in that it shows while the defendant has accepted his guilt on the charged offenses, he does not appear to be committed to making the victims of his crimes whole.

Notably, the defendant reinvented himself and, with his wife, began an eCommerce business that was featured in a YouTube video that aired one year ago in 2024 (https://www.youtube.com/watch?v=auEqr8yKJwA). (PSR ¶ 95, n. 4.) Based on the video, the business appears to have started in the fall of 2022 and, in the video, the defendant and his wife describe the various stages of the development of the business, including gross sales of $400,000 in 2023 and $250,000 in sales using TikTok shop in a one month around December 2023. After the draft Presentence Report was issued on August 15, 2025, the defendant submitted to the Probation Office a profit and loss report from September 1, 2024 to August 31, 2025, which showed a negative net profit of approximately $25,000. (PSR ¶ 95.) In apparent contrast to this documentation submitted by the defendant, the defendant's wife reported that the family is doing well with the profits derived from the business. (*Id.* ¶ 95.) The Probation

Office further noted that, as of the time of the final Presentence Report, the defendant had not disclosed information related to the revenues of the eCommerce business.   (PSR ¶ 102, n. 7.) Despite the apparent success of this new business venture (according to the defendant's wife), the defendant has not paid any restitution in advance of sentencing.

### C.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

In this case, there is a strong need to promote respect for the law, reflect the seriousness of the offense, and provide just punishment for the offense.   The defendant's actions caused significant harm to both victims.   While Lender #1 was able to recoup its principal through the bankruptcy process, Lender #1 incurred significant litigation costs in trying to undo the harm that the defendant caused.   Lender #2 has over $56 million in unpaid principal and interest on its loan and, like Lender #1, committed substantial time and resources to minimize the damage caused by the defendant.   The defendant brazenly lied to both victims for years and routinely provided them with false documents, some of which contained forged signatures, and his fraudulent conduct stopped only after it was discovered by the victims.   In these circumstances, a sentence of incarceration within the guidelines range is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

### D.  The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

To a white-collar defendant, a sentence of probation or home detention, fines, and restitution is the cost of doing business.   The government does not believe that those penalties are effective punishment for this defendant, based on the actual harm caused by his scheme, the length of the scheme, and number of false and forged documents that the defendant created and

passed off as authentic.   Indeed, the scheme started when he needed money to repay a $20 million debt—which was incurred because, by his own admission, he misspent client money— and, a little over a year later, he sought almost $50 million from Lender #2 and used most of that money to repay creditors.   If the scheme had not been detected in June 2022, there is every reason to believe that the defendant would have solicited money from other victims to repay the millions of dollars owed to Lender #2.

A sentence of incarceration within the guidelines range will go a long way toward deterring this defendant from committing another crime and deterring others from committing similar crimes.   The government believes that if the defendant knew that he would go to jail for his crimes, he never would have engaged in the fraud scheme.   That is effective deterrence and that is why a sentence of incarceration is needed here.

### E.  The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

There is no need to adjust the defendant's sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."   18 U.S.C. § 3553(a)(2)(D).

### F.  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

There are no co-defendants in this case.

### G.  The need to provide restitution to any victims of the offense.

The government seeks restitution in the following amounts:

- **Lender #1:** $336,459.50 for legal fees incurred at the request of the government as part of its criminal investigation and prosecution.  *See Lagos v. United States*, 584

U.S. 577 (2018).   These fees were incurred in connection with (1) responding to a subpoena and other requests issued as part of the criminal investigation and prosecution; (2) preparing a witness from Lender #2 for interviews by the U.S. Attorney's Office; and (3) meetings with the U.S. Attorney's office.

- **Lender #2:** a total of $56,903,157.36 based on:

  - $280,115.60 for legal fees recoverable under *Lagos*.   These fees were incurred in connection with (1) responding to document and information requests made by the U.S. Attorney's Office as part of the criminal investigation and prosecution and valuation of collateral for sentencing purposes; and (2) meetings with the U.S. Attorney's office.

  - $87,982.75 for additional fees incurred at the request of the government under *Lagos*—specifically, fees associated with providing the fair market value of a piece of collateral and responding to a defense expert report regarding the same.

  - $42,814,369.46 in unpaid principal.

  - $13,720,689.55 in prejudgment interest.   *See United States v. Fumo*, 655 F.3d 288, 321 (3d Cir. 2011), as amended (Sept. 15, 2011) (citing cases, including *William A. Graham Co. v. Haughey*, 646 F.3d 138, 145 (3d Cir. 2011), which noted that in order to make a victim whole, prejudgment interest may be necessary to "allow an injured party to recoup the time-value of his loss"); *Gov't of Virgin Islands v. Davis*, 43 F.3d 41, 47 (3d Cir. 1994) (decided under prior restitution statute, VWPA; holding that district court's incorporation of

prejudgment interest in the restitution amount was proper to effect full
compensation).

## V.    CONCLUSION

For the reasons discussed above, the government submits that a sentence of incarceration
within the 51- to 63-month guidelines range, three years of supervised release, restitution in the
amount of $57,239,616.86, and forfeiture of the defendant's ill-gotten gains is warranted based
on an application of the 18 U.S.C. § 3553(a) factors.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Francis A. Weber*
FRANCIS A. WEBER
ANITA EVE
Assistant United States Attorneys

Date:   September 16, 2025

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Sentencing Memorandum was served by ECF and email upon the following defense counsel:

Jenny Kramer (jenny.kramer@alston.com)
Scott O'Brien (scott.obrien@alston.com)
Emilia McKee Vassallo (mckeevassalloe@ballardspahr.com)

_/s/ Francis A. Weber_
FRANCIS A. WEBER
Assistant United States Attorney

Date:   September 16, 2025

25